Good morning, your honors. May it please the court. My name is Tony Birgo from the law firm of Ogletree Deacons. Here on behalf of the petitioner, Altura Communication Solutions. This is a petition for review of a decision of the National Labor Relations Board. I'm happy to have on my panel a seasoned labor lawyer who understands and frankly litigated some of these issues before being on the bench. I should tell you, one of the things I remember from arguing in the fourth circuit once was making a really good argument. A lawyer, the judge on the bench said, yes, but isn't the NLRB the Supreme Court of Labor Law? And that's simply not true. The Supreme Court is the Supreme Court. That's sort of what I thought, but go ahead. And the fact is what the board did in this case was not do its duty as the Supreme Court has made clear in multiple cases over. And that comes from a handful of really approaches that it took here. One, from an Administrative Procedure Act standpoint, it simply failed to look at the record as a whole in looking in, in issuing its decision. Under universal camera, as this court clearly knows, an agency must look not only at those facts that support its findings, but also those that are contrary to or detract from those findings. The agency did not do that. And that's further complicated in a bad faith bargaining case. Because the standard in a bad faith bargaining case is to look at the totality of conduct of a party, not merely isolated issues that the board may have. It must look at the forest and not just the court. Yeah, of course the board says it did that. And the IA and the board, just a minute. Sure. In addition to the discussion of the bargaining back and forth and the bargaining proposals, a set of other considerations that they say support the conclusion that there was bad faith bargaining, including the location of the bargaining and the insistence on prior written documents and the statement, even at the outset, about we have to start all over again and various surrounding circumstances that they, so they certainly did more than just look at the contract proposals and the results. So why don't they look at the totality of the circumstances? Because looking at the totality of the circumstances goes back to universal camera and also requires looking at those factors that evidence the employer's good faith during the course of overall bargaining. And that goes back starting in June to the scheduling of the initial seven sessions per the party's typical arrangement and bargaining, the willingness to add three additional sessions when it looked like things were bogged down, it's full compliance with all information requests, it's unusual step, even though it didn't necessarily provide a technical inability to pay argument of in fact, providing financial information, which is Judge Berzon knows, it's not something it's required to do at the presence of top executive leadership at the table, the bargaining notes, reflecting clearly reason to explanations for each of its proposals, the concessions made throughout the course. As I read the board opinion, as opposed to the IJ opinion, the board opinion is essentially saying, well, all of that may be true, but, or maybe it's the board grief more than that. But if you look at what happened from October on, there was bad faith bargaining. They're essentially saying there may not have been bad faith bargaining until October, but starting in October, there was bad faith. Okay, and let's talk about that because the issue becomes you can't isolate starting in October from the prior four months. You have to look at the overall course of conduct and see where we're at. Second, clearly the board's decision relied almost exclusively, if not exclusively on its assessment of the bargaining proposals, which clearly are a slanted view of those proposals, clearly paid no attention to the preexisting language that was in the existing collective bargaining agreement, which was carried forward. Plainly, this states what the proposals were in trying to shoehorn this case into a case like Regency Carts, which this is not that case. There's nothing wrong with making a proposal, for example, of minimum wage rates with an ability to offer discretionary increases over and above that. That is McClatchy. That is the case that this court decided just a year ago in IATSE, that merit increases on top of a minimum is not somehow an offensive proposal. The only thing that McClatchy says is, you can bargain at the impasse, you just can't unilaterally implement it. And Altura did not unilaterally implement it. And we can say that with respect to all of the company's proposals. It's notable that the Supreme Court has made clear and this court's made clear that the Labor Board does not have any special expertise in contract interpretation. Obviously, if it doesn't have expertise in contract interpretation, it doesn't have expertise in interpretation of proposals for contract provisions. That's clear under the Supreme Court's decision in Lytton. And this court in Joint Executive Board of Las Vegas made clear that it doesn't owe deference to the board's interpretation of the contract provisions. So what does that leave us? If the company bargained- But just to take the contract proposals in, the board did concentrate, consistent with this October motion, on the last offer, not the first offer. And it, the BIA itself, I mean the BIA, the NLRB. And it seems to me that, I mean, what they were saying, essentially, was that this offer was really a proposal to not have the union represent its members in any meaningful way because of the breadth of the Management Rights Clause. The fact, and most, to me, the most telling thing was this notion that they could have non-union workers do any of the work in the unit. So in other words, you can eliminate the unit. And also, you can, this benefits proposal, which seemed to be that we can give any benefits we want as long as we give them to non-union workers. So we can just, we're not gonna have any agreement with you about benefits. It's all gonna be in a separate book and we'll do what we want with it. Is that right? No, it's not. It's simply a wrong description of the proposals. First of all, with respect to the benefits, the parties have long agreed that with respect to group insurance benefits, health insurance, long-term disability, short-term disability, that it would be a parity relationship. It would be a me-too relationship. And that's consistent with how a lot of- And therefore could be zero. It could theoretically be zero, but the protection is in the parity relationship that it would have to be zero for all the non-union people including executives. Yeah, that's why you have unions because it's not that unusual to have non-union workplaces with no health benefits. Yeah, although that ignores the 40 plus year history here between the parties, including many, many years of having that parity relationship. But my understanding is that the, and I'm not that clear on it, so you should make me clear on it, but that the prior agreements as to other benefits were spelled out in the contract. And this proposal was take them all out of the contract and we're just gonna do whatever we're doing for the non-union people. That is not the case. In this case, the company was very clear with respect to the pension benefits, the company was continuing to participate in the IBEW National Plan. With respect to the health insurance and other group insurance benefits, it would be carried over just like it had been in prior agreements as a parity relationship, which is consistent with what the parties had always done in the past. And it's consistent with what this court found to be completely lawful in the IATSE case just a year ago. That same issue was presented. With respect to all the paid time off issues, those were set forth in the handbook and the company guaranteed they would not be reduced during the term. And frankly, we're at parity with the old PTO, paid time off, vacation, sick leave, other benefits. And there was a guarantee they wouldn't go down, although they could go up. Companies do do things like add holidays or shift holidays around. And doing that to be consistent when you have a small unit of 50 people spread throughout the country, simply makes sense from an administrative standpoint, which is what the company explained at the table. The notes are, as Judge Rizal probably knows from negotiating contracts, were so detailed. Excuse me, let's leave me out of this, please. And as a matter of fact, I never negotiated a contract. But why don't you just leave me out of this? Sure. The notes are incredibly detailed in showing what was done. And casting this case as simply suggesting that the union would be better off without a contract ignores the guarantees on the wages, the guarantees on the pension benefits, the just cause discipline provision, the final and binding arbitration provision, including relative to discharge. It ignores the seniority rules of the layoff provisions and the promotion and transfer provisions, ignores dues check off and mandatory membership in those states that were there. It ignores union time off, paid time in order to process grievances. This is not regency courts. This is not- What about the provision that any work can be done by any... Unit work doesn't have to be done by any members. It can be done by anybody. Two things. The prior contract, as we spelled out, makes clear that there was not exclusive jurisdiction for the union as to any work except the old legacy pre-1984 work. There has long been shared jurisdiction as between the company and, I'm sorry, the union and non-union employees. Further, the old contract did not place limits on contracting out at all. The company's proposal simply simplified those provisions going forward. The labor board simply ignored the preexisting contract in concluding that the company, in seeking to simplify and carry those provisions forward, in trying to create some inference that that suggests the company didn't want an agreement. It's the union that was asking for a new and different agreement than what we had before by trying to restrict the use of contractors. Also, from a very practical standpoint with this company, as we tried to spell out, you have to visualize a company in which you have 50 field technicians spread through 15 or 20 different geographic locations. Each of these sort of reporting sites consists of one or two or three people. So the issue in terms of practically doing work with the staff that existed required some jiggering about of how do you manage non-union folks? How do you service customers if your folks are fully employed or they don't have the unique skill set necessary at that moment to fulfill those services? And that's why the company and union had always agreed to permit contractors. If I may, I'd like- Your time's about up. I just, so was the board required to entirely disregard the June 4th proposal? No, I think you don't completely disregard it. I think you look at the entire course of dealing across the entire period. And when it shows the company continues to move, the company ultimately gets to the point, ultimately can only look at the last best final, as I'm sure all the judges are aware. Parties often start out in negotiations with provisions that they don't expect to get, but it's part of the bargaining process. Unions often come to the table asking for 20% increases or $5 an hour increases with no expectation of getting that. So, you don't necessarily look at the June proposal as dispositive. They didn't. By that we know what they didn't do, right? That's not the problem. Right, that's not the problem. I mean, they did, or the IJ did, and the board may have, note that the employer kept declaring, kept saying we're at impasse and this is the last best final, when quite obviously it was not. But ultimately, it relied on the last best final and everything that led up to it. Judge Bob, did you have a question? No, I'm good, thank you. Okay, well then you're time is up. May I respond to your last comment, Judge Prasad? Yeah, on the issue of this premature declaration of impasse, the only time that impasse is pertinent is if the company either implements its last best and final. Well, that's what you're saying. The NLRB's view seemed to be that it's not the only time because there was a demonstration that the employer was, the company was trying, was intent on, it was some evidence that they were simply going through motions and wanted to get this over with. And then they, after they declared this, then they had second thoughts. Maybe they thought they couldn't substantiate it at that point, but it seemed, it was some indication that there was the, what was the process here was to do as much bargaining as they had to do in order to be able to make an argument that they had satisfied their obligation and then stop. That seemed to be what was relevant to them. But Judge, the Supreme Court has been very clear and the board has consistently said in other cases, once a party is at the end of its rope, it's entitled to say it doesn't have any further proposals and to test whether the union has any additional proposals to make. The law of impasse also recognizes that impasse is only a temporary state. And there may certainly be situations that arise in the next month or the next six weeks that then change that and require a party to go back to the table and revisit in an effort to reach a decision, which is what the company did with the mediation. And it did provide some additional concessions, clearly showing overall, it's intent to try and get to an agreement rather than to avoid an agreement. A party is also entitled to ask for some assurance beyond simply the union saying, hey, we have other proposals to make to see at some point whether this promise of additional proposals will actually break an impasse. The DC circuits made that clear in Saramonte and in Truesurf. There's a very clear longstanding precedent on all of these issues, which the board simply ignored. Okay, thank you very much. You're over your time. I hope you will give your amendment. Thank you. Ms. Rajapaksa. Thank you, your honor. May it please the court. My name is Meelakshmi Rajapaksa. I'm counsel for the National Labor Relations Board. The statute that we're dealing with in this case, the National Labor Relations Act, requires parties to collective bargaining to enter into the process with a sincere effort to reach an adjustment of differences and a collective bargaining agreement. In this case, the board found based on truly an abundance of evidence in the record that Altura didn't make the requisite sincere effort. And the board of course looked in part at the proposals, but the proposals I'd like to emphasize are only part of the story. As the court has already recognized, there's several other factors that the board considered that had to do with conduct and bargaining. But let me begin with the proposals. Altura presented a final contract offer to the union that essentially asked the union to surrender its right to represent employees in certain very significant areas, specifically wages, hours, bargaining unit work, what work is performed traditionally by the bargaining unit, layoffs, performance standards and policies that have to do with the workplace, healthcare benefits and a variety of other benefits were also moved to a non-negotiable handbook. And so there's plenty- Mr. Biargo says two things about that, as I understand it and it'll be helpful to respond. One is that some of this or even most of it was in the prior agreement or something like it was in the prior agreement and that wasn't taken into account. And second of all, that at least some of the, when I asked him, for example, whether it was accurate that the healthcare was being transferred, he said, well, he said that was always the way it was on the healthcare and on some of the other provisions that there were some assurances of continuity, at least practical ones. So what is the response to that? Mr. Biargo is right that the company didn't seek to move all benefits to the handbook, but it did seek to move a variety of benefits to the handbook. And there is no comparator in the old agreement to that language about referring benefits like vacation. So what that means specifically is that in the old agreement, it said you are entitled to X benefit and moving it to the handbook sounds benign, but what it really means is we can have them if we want them or not have them if we don't want them. Precisely, that's precisely right. And even as to healthcare, which is still in the contract, the company newly seized authority to change or eliminate healthcare, which is a significant departure from the existing contract. In terms of things that are novel or new in this proposal, let me just highlight that the two-tier wage system is completely new. And under that wage system, the company proposed to cut employees' wages in one classification by over $5. And then it also took authority to raise wages in its full discretion and also possibly reduce wages by moving people from a higher classification to a lower one. The union would not have any voice in any of that. In addition, it eliminated any possibility of guaranteed work hours. And that is in article 10 of the company's proposal. Were there ever guaranteed work hours? There was no affirmative. Well, in the overtime provisions of the old agreement, there was somewhat of a recognition that a regular work week is 40 hours. But what this proposal did that was different is that it affirmatively said, you do not have any guarantee of any work hours. There's no language like that in the old agreement. In addition, the layoff provision is completely changed so that people can be laid off without regard to seniority. And as Judge Berzon has already noted, there were in several places provisions on the possible diversion of unit work or work that had historically been performed by the bargaining unit to non-bargaining unit. On that, Ms. Bierba says again that there was no guarantee, that there was already no limitation on- I believe he, well, he was very careful in his answer. And I appreciate that because what he said is that there was a recognition in the old agreement that certain kinds of work performed as of 1994 were considered unit work under the old agreement. And in this agreement, there was not only an abolition of any concept of unit work that was very forcefully done in three different places, but there was also this idea that no one has any jurisdiction over any, or ownership over any work that's in article 10. And in the management rights clause in two different places, the company said we can assign essentially work to anyone, whether in the unit or not. The old agreement very significantly placed limitations on that kind of authority. So the company could give under certain circumstances what had been historically bargaining unit work to non-bargaining unit employees, but only if it would not precipitate the layoffs of any bargaining unit employees. And there was a broad recognition that the company's purpose and the union's purpose was to ensure work for this group of employees. Any such guarantee was eliminated in the company's October 2nd, 2015 proposal. So this is really a proposal that did a broad-based damage to the union's right to represent workers. But what kind of adds to the sting of these unilateral provisions is the fact that the company also closed off avenues for the union to challenge its exercise, the company's exercise of unilateral authority. So for example, the zipper clause prevented the union from requesting bargaining over anything, whether in the agreement or not in the agreement during the life of the agreement. It also- How is this, zipper clauses are traditional. How is this one broader? And what is the usual one? Right, so a zipper clause can say everything, and they often do say anything that has been discussed in these negotiations has been discussed fully and the company and the union waive their right to bargain over matters covered by this agreement. What is different about this zipper clause is that it says the parties waive bargaining whether over matters, whether or not they are covered by this agreement. And to be fair, there was similar or comparable language in the old agreement. But what the board looked at is this zipper clause in the context of the sweeping unilateral authority that the company sought to take in this case, in the context of all of these unilateral powers, that zipper clause is extremely damaging because it prevented the union from requesting any kind of negotiation or discussion over a unilateral change that the company has thought to make. In addition, in the management rights clause, the company excluded from the scope of grievances and arbitration, its exercise of any number of unilateral rights that it newly took. And then there's a no strike clause that prevents the union from even taking the very small step of hand-billing to try and challenge some of the employer's actions if they took unilateral action. And so the board appropriately and reasonably found based on all of these different things that the company essentially was asking the union to speed its representational function. And by doing that, it was basically making any sort of meaningful collective bargaining impossible. So- There was language in there, please. Go ahead. I'm sorry, I just wanted to ask you, counsel, would it not be reasonable for us to conclude that at least until some point, the company's actions here were nothing more than hardball negotiating? Right, so over the course of the summer, you could say, and I think the board acknowledged that the company was taking a hard line, but it was still making a sincere effort to reach agreement. Things sort of turned in August after the company presented a last, best, and final offer, it essentially appears to have decided that it was finished with collective bargaining. Whether the union had reached the end of its rope or not, the company was done. And at that point, you see the false declarations of impasse, the preconditions on meetings, the essential refusal to sit down that is sort of the bedrock of collective bargaining. So in August, do you think that's where it crossed over into acting in bad faith? Yes, but the board did, I have to take issue with the company's representations in this argument and also in the briefs, that the board didn't take full cognizance of the entire course of bargaining. This decision is over 50 pages. It does encompass the administrative logistics findings, which are exceedingly detailed about the step-by-step exchange of proposals and what each party did and said. And so the idea that the board ignored evidence really is belied by this very lengthy decision. And to the extent that Mr. Biergo has claimed that the board is dubious, whether the board adopted the ALJ's findings, I would just like to make it clear by citing some portions of the decision that it is unequivocal that the board did affirm the judge with just minor adjustments. So on page one of the slope opinion in the second paragraph, the board says, it is considered the decision in the record  and has decided to affirm the judge's rulings, findings and conclusions as further discussed below. On page two, the board says, and this is in the supplemental appendix that the board submitted, as explained below and in the judge's decision, this is a case in which a party didn't make a sincere effort to bargain. And then the board says, relying as the judge did on the combination of facts present in this case, we affirm the judge's finding. So, and I could go on because there are yet more statements, but the point is that the board did very fairly consider all of the evidence and the evidence that Mr. Biergo has referred to in terms of the supposedly benevolent provisions in the contract that the board didn't specifically consider in its analysis. It did actually recite those provisions as a factual matter. But those, what I think is critical is those provisions, however generous they may be, did nothing to operate as a check on the employer's unilateral authority, which in the general- They did something to, I mean, for example, they couldn't pay less than the minimum amount of pay that was in the contract and they, go ahead. Well, your honor, as to that, for example, that is a bit of an obfuscation on the company's part, because in fact, there's a level AA minimum wage for level AA technicians, but the company could demote someone to level A and then effectively reduce their pay. So the level AA- But still, there's a bottom line. The bottom is the level A classification wage. So there's something, there is some limitation, which is above the minimum wage. But I will also note that even as to that so-called floor, the company's wage proposal included language saying that it could pay below that floor for the first five years of an employee's employment. So, I mean, even the thing- But by a specific amount. And in the end, there was a bottom, bottom line. There was, there was. But my point is simply that the company's emphasis on these sort of hard standards in the agreement, they're very hard to find. There was much more unilateralism than guarantees of anything. And that is really what was problematic. And the board rightly focused on that point in evaluating. It's not that it ignored the good, the so-called good proposals, but it looked at whether those good proposals at all tempered the other things that were extremely damaging to both employees and- The other thing about the wages is that ultimately they could put somebody else in that job and eliminate the job altogether. And then the person doesn't get any pay. Exactly, Your Honor. And to that point, let me just give another example. The company refers to the Just Cause Discipline provision, and that's all well and good. But the reality is that the employer took the authority to unilaterally lay off anyone in its own discretion for reasons of attitude or whatever it may be. It could lay off the entire bargaining unit and divert all of the work to non-bargaining unit employees. So the presence of a Just Cause provision doesn't really help employees very much. It doesn't counteract that sweeping authority that the employer took for itself. And so I know that my time is nearly up, but I will say the board was extremely fair in its assessment of all the evidence. The company has waived any challenge to a lot of the indicia on which the board relied in finding bad faith. And we would ask that the court- Can I just ask what you mean by that? What did it waive? So the indicia of bad faith, other than the proposals, other than the- In terms of the meetings, where the meetings were and all. Right, the refusal to sit down and meet, the preconditions on meetings, the arbitrary deadlines, the dismissing union concessions out of hand and refusing to meet on them. All of those things are not in the company's opening brief. And I'll just briefly say, this court doesn't need my two cents about Rule 28 of the Federal Rules of Appellate Procedure, but that rule sets forth very clear standards for opening briefs and principal briefs. And the company just didn't meet the standard at all to preserve any challenge on those other indicia of bad faith. Okay, thank you very much. Mr. Villarreal. You are on mute. We can't hear you. Yep, thank you. Okay. I know I only have a minute here and we'll only sort of sum up with a couple of things. One, there is absolutely no finding by the board that any single of the company's proposals were unlawful or inappropriate. But that's not the question. That's not the question, right? But the question is, and when the Supreme Court says the courts and the board may not sit in judgment of the proposals, the only thing the court can do and the board can do is say, in sum, do they leave the union and the employees better off or worse off than if they had no contract whatsoever? And that is not what the company's proposal did. And it's not what the company's proposal- But that's not the only standard. I mean, isn't it the ultimate? It's a very fine line, definitely. But the question is whether the proposals that were made so undermine the union that one doesn't actually believe that anybody was trying to do anything by no greed of it. I mean, it's ultimately a subjective question. That's what's so horrid about it. And that makes it very hard for us to overturn the board. But it is ultimately, in other words, it's not an objective standard. Are these proposals such that the union would have no role? You can correct me if I'm wrong. This is my understanding. It's subjective standard. Whether these proposals couldn't have been made in good faith because they knew there was no chance of getting agreement on them. And there wouldn't be because the union would be so undermined. Whether it was completely undermined is not necessary. It would be so undermined that no union would agree to this. And respectfully, Judge, that is not the standard. Okay, and what case are we talking about? I think if you look at all of the cases that go back to this court's decisions in Seattle First and Tomco, the court's decision last year in IATSE that followed that precedent. And you distinguish the board cases on the facts that what the board has tried to do here is take the cases like Regency Carts and Public Service of Oklahoma and shoehorn this case into those cases without showing where they're on all fours. The reality is you cannot, without running afoul of American National Insurance, the Supreme Court's seminal case on the idea that you cannot get into subjective assessments of the proposals and you cannot try and achieve by trying to regulate bargaining, requiring parties to make concessions, that you can't look at it from the standpoint of, does this union simply refuse to agree to these things? Is it so anathema to them that they don't want to agree to it and they would rather go without a contract than to have this one? Or the standard that the court and the boards have regularly indicated, is it so bad that no union would ever agree to it because they have less rights than they would without a contract at all? Which is not the case. Where is that language from? They have no, no, they have to have, they have to objectively have no less rights than they would have without a contract. That's in either Regency Carts or Public Service of Oklahoma, which are the two cases that the board relies on most critically. It can never be based on whether a union or employer won't agree to what the other side wants. That happens in negotiations. Parties deadlock. That's why unions strike. They try and force something that the company doesn't want to agree to. And understand this rule here of assessment of proposals cuts both ways. The duty to bargain under Section 8D is a mutual obligation and that obligation runs both ways. So when the court starts stepping in or the board starts stepping in and putting their thumbs on the substance of proposals, it disrupts the process. And all the court needs to do is ask itself, what is the effect of this decision on negotiations? The effect here would be in requiring the company to concede something that it hadn't conceded before. Which is exactly what Section 8D expressly says when the duty to bargain does not require either party to make a concession. And the Supreme Court and the board have repeatedly recognized that. So that must leave you with the, is the proposal so bad that under the totality of circumstances case standard, the totality of conduct, does it show that the party is attempting to avoid an agreement altogether? Or as Judge Brugia pointed out, is simply perhaps engaging in hard bargaining to get a contract on terms that it views as acceptable, but nonetheless a meaningful contract with meaningful terms when you talk about guaranteed wages, pension benefits, just cause, union rights within the workplace, et cetera. Okay, thank you very much. Thank you both for really excellent arguments on both sides and usually so. So thank you very much. Thank you. The Al-Turah Communications versus NLRB case is submitted and we are adjourned. Thank you very much. Thank you.
judges: Boggs, Berzon, Murguia